GARY Y. LEUNG (Cal. Bar No. 302928)
Email: leungg@sec.gov
JASON P. LEE (Cal. Bar No. 196520)
Email: leeja@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Western Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.  2:17-cv-00897 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| THOMAS MILLER and WILLIAM LIANG, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants Miller and Liang reside in this district.

## SUMMARY

4.     This enforcement action concerns defendants' purposeful circumvention and exploitation of a publicly-traded company's internal accounting controls, and their subsequent lies to that company's auditors, all in an effort to prematurely recognize and thus misstate its revenue.  Until his resignation in 2014, Defendant Thomas Miller was the chief financial officer of a California-based technology company called Ixia.  Ixia's director of accounting was Defendant William Liang, and until 2014, when he was fired from the company, Liang was responsible for Ixia's revenue recognition accounting.  Each of them took affirmative steps to mislead Ixia's auditors while allowing perhaps the most important revenue recognition policy at the company, as well as generally accepted accounting principles ("GAAP"), to be violated.

5.     Ixia sells network testing, visibility and security products.  It typically sells a bundle of its products – hardware, software, post-contract support, and professional services – to customers in a single transaction, with none of those component products having been separately negotiated or priced.  These kinds of combination sales (known in accounting as "multi-element arrangements") are subject to GAAP that require Ixia to defer recognizing Ixia's software revenue from a given sale if certain criteria are not met.

6.     In 2012, Ixia was headed by Victor Alston.  Elevated to chief executive officer in May 2012, Alston pushed for Ixia's revenue and other financial metrics to meet or exceed consensus market expectations.  Discontent with the problems created by the deferral of Ixia's software revenue, Alston issued a directive to artificially split

professional services onto a separate purchase order whenever they were included in any sale ("Split POs" or "Splitting POs").  Splitting POs gave the false appearance that customers were buying Ixia's professional services in a stand-alone sale, and not as part of a multi-element arrangement with the company's software products.  It also allowed Ixia to prematurely recognize software revenue in contravention of its stated revenue recognition policy and GAAP.

7.  Miller and Liang were central figures in this course of events.  Not only did Miller internally enable and implement the tactic of Splitting POs, he further concealed from outside auditors the fact that the company – through Split POs – was exploiting a material weakness in Ixia's internal control over financial reporting ("ICFR") in order to prematurely recognize software revenue.  As for Liang, revenue recognition was his area of expertise within Ixia's finance department, and he willingly participated in Splitting POs along with Miller.  In fact, Liang was fully aware of the Split PO directive and worked directly with Ixia's auditors on revenue recognition issues, yet in face-to-face meetings with them during quarterly reviews in 2013, Liang concealed the fact that Ixia was purposefully Splitting POs.

8.  Following a 2014 internal investigation by its audit committee, Ixia restated its first and second quarter 2013 financial statements and, among other things, reversed in those periods nearly all revenue prematurely recognized because of Split POs.  The audit committee further concluded that the company had not maintained effective ICFR in the first and second quarters of 2013.  Upon completion of Ixia's internal investigation, Liang was terminated.  Miller was allowed to resign.

9.  By engaging in this conduct:  (i) Defendant Miller violated the lying to auditors provision of Rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2; the certification provision of Rule 13a-14, 17 C.F.R. § 240.13a-14; and the internal controls and books and records provisions of Section 13(b)(5) of the Exchange Act, 15 U.S.C. §78m(b)(5), and Rule 13b2-1 thereunder, 17 C.F.R. §240.13b2-1; and Miller aided and abetted Ixia's violations of Sections 13(b)(2)(A), and 13(b)(2)(B) of

the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and (b)(2)(B); and (ii) Defendant Liang violated the lying to auditors provision of Rule 13b2-2, 17 C.F.R. § 240.13b2-2; and the internal controls and books and records provisions of Section 13(b)(5) of the Exchange Act, 15 U.S.C. §78m(b)(5), and Rule 13b2-1 thereunder; and Liang aided and abetted Ixia's violations of Sections 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and (b)(2)(B).

10.    With this complaint, the SEC seeks permanent injunctions prohibiting future violations of the federal securities laws and an order requiring defendants to pay civil penalties.

## THE DEFENDANTS

11.    Thomas Miller, age 61, lives in Calabasas, California.  He joined Ixia in March 2000 as its chief financial officer.  He resigned from the company in March 2014.  Miller received his CPA license in November 1988.  His license was cancelled in June 1989 and was reinstated in June 2009.  His license is now inactive.

12.    William Liang, age 46, lives in Woodland Hills, California.  Liang was first employed at Ixia in 2007.  Over time, he served in various positions within the company's accounting and finance department, including as its senior manager of accounting, director of accounting, and North American controller.  In the relevant timeframe, Liang was Ixia's director of accounting, and was responsible for Ixia's revenue recognition accounting.  Ixia terminated Liang's employment at or around the third quarter of 2013 based on findings from its Audit Committee's internal investigation.  Liang received his CPA license in May 1997.  His license expired in November 2001.

## RELEVANT ENTITY AND PERSON

13.    Ixia is a California corporation based in Calabasas, California.  The company's securities trade on the NASDAQ Global Select Market and are registered with the SEC pursuant to Exchange Act Section 12(b).

14.    Victor Alston, age 39, joined Ixia as its vice president of applications at

or around 2004 and served in sequentially higher positions until his elevation to chief executive officer and president at or around May 2012.  Alston left Ixia in October 2013 following certain findings from Ixia's internal investigation.

## THE ALLEGATIONS

**A.    Ixia's Revenue Recognition for Multi-Element Arrangements**

15.    Like many of its peers in the software and hardware industry, Ixia was required to defer revenue on certain significant transactions in accordance with GAAP.

16.    Ixia's primary product line is a combination of hardware and software designed to test, assess, and validate the performance of technology networks.

17.    Ixia also sells post-contract support ("PCS"), which is a line of products that includes technical support and extended warranty and maintenance for Ixia's hardware and software products.

18.    Ixia further sells professional services, including providing customized software and product training in the use of Ixia's hardware and software.

19.    Because Ixia typically sold a combination of its products to customers in a single transaction, those sales were "multi-element arrangements" subject to revenue recognition rules that required deferral of some or all of the revenue depending on the products included in the sale, and how they related to each other.

20.    Under GAAP, revenue from a multi-element arrangement involving software must be allocated to each element (e.g., the separate products sold in the combination sale) based on the fair value of each element (e.g., the dollar value of that element as established through evidence of a consistent price paid by customers for the same or similar element), as measured by vendor-specific objective evidence of fair value ("VSOE").

21.    Thus, if VSOE does not exist for an undelivered software element, then any software revenue from the multi-element arrangement must be deferred until either the point in time when all elements have been delivered to the customer, or

when VSOE does exist for each individual element, whichever is earlier.

22.     Consistent with this, Ixia's internal revenue recognition policy provided that:

> If evidence of fair value (or VSOE) cannot be established for an undelivered element within the software group or software arrangement, we defer revenue on the entire order until the earlier of (i) delivery of all elements or (ii) establishment of VSOE of the undelivered element.  We have not been able to establish VSOE for our Professional Services, therefore, if the only undelivered element is Professional Services, the entire order or group is recognized as revenue over the service term or when the service is completed, depending on the arrangement.

23.     Miller was Ixia's chief financial officer.  He had ultimate responsibility for the company's revenue recognition policy.

24.     As the head of Ixia's finance group, Miller also reviewed Ixia's revenue recognition policy, and once finalized, he distributed a summary of that policy to all Ixia employees.

25.     Liang was the accountant responsible for the accounting of most if not all of Ixia's revenue.  He was also involved in the preparation of Ixia's policy.

26.     Ixia's revenue recognition policy was authored in part by Liang.  Liang, in addition, shared responsibility for reviewing the document as a whole prior to its internal distribution at Ixia.

27.     Crucially, however, Ixia had never established VSOE for any of its professional services.

28.     Accordingly, Miller and Liang both knew that GAAP and Ixia's revenue recognition policy compelled the following – whenever Ixia sold a combination of software and professional services in a multi-element arrangement, Ixia was prohibited from recognizing revenue from its sale of the software element until delivery of the professional services element was completed.

29.     In time, Alston took issue with these limitations because the inclusion of

professional services in a sale, which was typically a nominal component of the total deal, could have an outsized and disproportionate effect on the company's ability to recognize software revenue immediately.

30.     Alston eventually enlisted Miller and Liang to circumvent those limits.

**B.      Ixia's Struggles with Deferred Revenue**

31.     While each quarter was in progress, Ixia provided analysts and investors with guidance on the amount of revenue management expected Ixia to report upon quarter-end.

32.     Once issued, Ixia's management prioritized meeting that guidance.

33.     Their ability to do so, however, was complicated by the nature of Ixia's business, its sales arrangements with customers, and the accounting rules governing revenue recognition.

34.     Most significantly, even when Ixia's sales for the quarter appeared to be in the range of its previously-issued revenue guidance if those sales were all recognized as revenue, Ixia remained at risk of missing its revenue guidance whenever a sale included multi-element arrangements involving professional services.  That was because GAAP and Ixia's revenue policy could require deferral of software revenue to later reporting periods.

35.     A further complication arose from the nature of Ixia's professional services.  Many of Ixia's customers had discretion as to when to schedule training sessions; hence, Ixia often had no ability or insight into when it could complete delivery of professional services sold through a multi-element arrangement.

36.     Since Ixia's ability to recognize revenue from software sold with professional services in a multi-element arrangement depended on complete delivery of the professional services element, this aspect of Ixia's business added another layer of risk and uncertainty that Ixia might fall short of its revenue guidance in any given quarter.

37.     The uncertainty arising from Ixia's multi-element arrangements,

combined with fluctuating customer demand, placed pressure on management at the end of Ixia's reporting periods.

38.     As aptly described by its vice president of sales, "we always have 15% of deals that cannot be recognized for one reason or another," thus posing a significant risk that Ixia would "miss street expectations wildly."

**C.     Ixia Splits POs to Immediately Recognize More Revenue**

39.     Events at the end of third quarter 2012 coalesced to place the impact of these accounting rules on Ixia's revenue recognition in sharp focus.  On September 28, 2012, Ixia closed a significant, seven-figure sale to a large technology company.

40.     The transaction was a multi-element arrangement comprised of software and PCS, along with a nominal amount of hardware and professional services.

41.     Although in the aggregate the value of the deal was substantial, Ixia could not recognize any of the revenue from the software licensed in the transaction in third quarter 2012 because the professional services sold to Ixia's customer would not be delivered in the two days before quarter-end.

42.     Once briefed on the situation, Alston instructed Miller and the Ixia senior director responsible for its professional services group to meet with him, every other week, to review status on delivery of professional services, pronouncing: "This is important for revenue recognition."

43.     Soon thereafter, however, Miller learned that the recognition of revenue from Ixia's large transaction at the end of third quarter 2012 would be deferred even further since Ixia's customer had decided that it wanted delivery of professional services to complete in 2013, rather than fourth quarter 2012.

44.     Miller was told that:

> We were trying to schedule the second two weeks [of professional
> services] in early December.  Yesterday the customer confirmed
> this CANNOT happen this year … Therefore we must go back to
> the customer and propose some options if we must have it this
> quarter …

45.     Faced with this, certain Ixia employees asked its customer to "split" its original purchase order into two purchase orders to falsely create the impression that there were two transactions instead of one.

46.     One purchase order would refer to software and already-completed professional services.

47.     The other purchase order would reference the uncompleted professional services previously negotiated and agreed to by the customer.

48.     The terms of the original transaction with its customer – agreed to back on September 28, 2012 – were left undisturbed.  The only difference arose now from the issuance of two purchase orders, rather than one, to document what remained in substance a single multi-element arrangement.

49.     Ixia's customer agreed to its request and submitted new purchase orders. On that fiction, Ixia prematurely recognized approximately $530,000 of software revenue from the deal in 2012.

50.     Miller and Liang were both involved in and knew of the decision to Split POs for this significant transaction.

51.     This course of action, however, violated Ixia's revenue recognition policy, which strictly prohibited "[p]romises and commitments to customers outside of the quote or customer contract," and further required that the quote or customer contract "represent the entire agreement between Ixia and the customer with respect to deliverables."

52.     Even so, Miller soon approved of expanding this practice throughout Ixia, in the case of every combination sale involving professional services.

53.     On October 26, 2012, following Miller's review and approval of his draft email, Ixia's vice president of sales wrote the following to his sales executives:

> Please cascade throughout all of your teams.
>
> I need to update you all on a decision Tom [Miller] and I have
> made over the past few days after looking back at Q3 and what we

feel to be appropriate moves to ensure we do not have the last minute challenges on meeting our revenue commitments quarter to quarter.

Do keep in mind [professional services] is now becoming a critical factor in developing our business and evolving to stronger customer engagement for the longer term.  The "rules" we want to apply are a [sic] aimed at reducing risk on a continuous basis, below are the steps we will be needing to monitor with great care …

1.  All customer quotations that require delivery of services should separate product and services on different quotations. ) this [sic] is the ideal position.

2.  Should the customer demand combined quotations then if the deal is combined greater than 100K it should be escalated to myself and to Tom [Miller] for review and approval going forward …

54.    As instructed by Miller and Ixia's vice president of sales, Ixia's sales force began submitting two separate quotes to Ixia's customers whenever the company offered a multi-element arrangement involving professional services.  The sales team then asked customers to submit two separate purchase orders.  Those Split POs did not cross-reference one another, nor did they otherwise indicate that they involved a related sale and were not independent sales.

55.    This practice fundamentally changed the way Ixia historically conducted business with its customers.  As put by its vice president of sales, who voiced concerns about the practice, "nobody would [p]ut a car and its engine on separate orders!!"

56.    Splitting POs caused the company to artificially create separate sales quotations, which led to separate purchase orders.

57.    The company's revenue recognition policy required that order documentation reflect the details of all other orders or open negotiations for products that were discussed as part of the order; in other words, it prohibited "side deals" not

1    reflected in a given customer quote or contract.

2         58.    Consequently, Split POs generated books and records that failed to

3    accurately reflect Ixia's sales transactions at the end of 2012 and in the first and

4    second quarters of 2013, thus resulting in the falsification of Ixia's books and records.

5         59.    Split POs had a further consequence – they resulted in the company's

6    improper premature recognition of software revenue in violation of GAAP.

7         60.    Split POs circumvented internal Ixia accounting controls designed to

8    ensure that order documentation was complete, and thus created a material weakness

9    in Ixia's ICFR – which had no procedures in place to practicably relink POs once

10   artificially split – that Miller and Liang then exploited.

11        61.    At all relevant times, both Miller and Liang understood that even if

12   professional services and software are reflected on a purportedly separate purchase

13   order, GAAP and Ixia's revenue recognition policy still required deferral of that

14   software revenue whenever sold in a multi-element arrangement along with

15   undelivered professional services.

16        62.    That was because the act of Splitting POs could not change the

17   underlying substance of a sales transaction, and was accordingly not an appropriate

18   basis to avoid deferring software revenue.

19        63.    Knowing this, Miller initially advised Alston against Splitting POs.  But

20   in the end, Miller – Ixia's chief financial officer and a trained accountant versed in

21   Ixia's revenue recognition policy – chose to approve and implement the Split POs

22   practice.

23        64.    As for Liang, he took no steps to halt the practice even though he had

24   responsibility for Ixia's revenue recognition and was the auditors' point of contact on

25   those issues.

26        65.    Indeed, when Ixia's revenue manager – who directly reported to Liang –

27   told Liang that Split POs was violating Ixia's revenue recognition policy and placing

28   the company's revenue at risk, Liang failed to heed his revenue manager's

COMPLAINT                                    11

reservations.  Instead, Liang simply responded that, "we have to do this," and then allowed the practice to continue.

66.   Splitting POs remained in force through the second quarter 2013.  And on April 21, 2013, Alston reiterated the importance of his directive in an email sent to, among others, key sales executives along with Miller and Liang:

> Team
>
> Carrier deals that involve services need to be quoted with [professional services] on a separate quote.
>
> We cannot have [hardware/software] and Services quoted on the same order.  That includes [professional services,] RE, or any other custom work.
>
> Ixia cannot deliver the quarter or meet revenue recognition any longer if we continue to book orders in this manner …
>
> Its [sic] not a business choice.  It's a business reality …

67.   Following Alston's email, Miller and Liang still failed to raise any objection, and Miller continued to approve of the practice even though it violated GAAP and circumvented Ixia's stated revenue recognition policy.  And so Split POs continued unchecked.

## D.   Ixia's 2012 Form 10-K

### 1.   Disclosures regarding Ixia's revenue recognition policy

68.   Given its significance to Ixia's financial statements, Ixia's 2012 Form 10-K explicitly referenced and incorporated Ixia's revenue recognition policy for multi-element arrangements in the company's disclosures to investors.

69.   Within the Form 10-K's discussion of its "Significant Accounting Policies" in the notes to the financial statements, the company represented that:

> As our systems typically include hardware and software products, and the related services, we recognize our revenue in accordance with authoritative guidance on both hardware and software revenue recognition.

***

If VSOE cannot be established for an undelivered element within the software group (or arrangement), we defer the entire value allocated to the software group (or arrangement) until the earlier of (i) delivery of all elements (other than technical support, warranty and software maintenance services, provided VSOE has been established) or (ii) establishment of VSOE of the undelivered element(s).

## 2.   Management's report on ICFR

70.   Rule 13a-15(f) of the Exchange Act defines ICFR as:

[A] process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with  generally accepted accounting principles[.]

71.   Item 308 of Regulation S-K required Ixia's management to provide a report on ICFR that contains management's assessment of the effectiveness of the company's ICFR; in that report, management must disclose any material weaknesses in the company's ICFR identified by management.  17 C.F.R. § 229.308(a).

72.   Further, Item 308 of Regulation S-K prohibited Ixia's management from concluding that its ICFR was effective if there were one or more material weaknesses in that ICFR.  17 C.F.R. § 229.308(a)(3).

73.   A "material weakness" in a company's ICFR is a "deficiency, or a combination of deficiencies, in [ICFR] such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."  17 C.F.R. § 210.1-02(a)(4).

74.   A misstatement is reasonably possible if the chance of a misstatement is more than remote but less than likely.  *See* Release No. 34-55929, Commission Guidance Regarding Management's Report on Internal Control Over Financial

Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934t 34-35, n. 47.

75.     Management's report on the company's ICFR is found in Item 9A of Ixia's 2012 Form 10-K.  That report, entitled "Management's Report on Internal Control over Financial Reporting," stated:

> As of December 31, 2012, our management (with the participation of our Chief Executive Officer and our Chief Financial Officer) conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").  Based on this evaluation, management concluded that our internal control over financial reporting was not effective as of December 31, 2012 based on criteria in Internal Control – Integrated Framework issued by the COSO.

76.     The report, however, set forth only two reasons that led to management's conclusion that Ixia's ICFR was not effective as of December 31, 2012.  Neither concerned Split POs.

77.     Rather, management's report only disclosed deficiencies arising from warranty and software maintenance revenue recognition.  And so in his report to the investing public on ICFR, Miller only represented that management had concluded that Ixia's ICFR was not effective.  He did not disclose that Splitting POs had been intentionally implemented at the company, or that management was exploiting a separate material weakness in Ixia's ICFR, one unrelated to the warranty and software maintenance revenue recognition deficiencies referenced by management's report.

E.     **Ixia's Accounting and Reporting Issues Come to Light**

78.     Splitting POs in contravention of Ixia's own revenue policies may have continued unchecked at the company but for an unrelated development in the second half 2013 – the company discovered that Alston had fabricated his education and

work experience when he first sought employment with Ixia.

79.     Ixia's audit committee then decided to conduct an internal investigation, the scope of which was later expanded to examine the accuracy of Ixia's SEC filings and incorporated financial statements.

80.     Following the audit committee's internal investigation, Ixia restated its first and second quarter 2013 financial statements on June 20, 2014.

81.     In its restatement, Ixia reversed software revenue from first and second quarter 2013 that had been prematurely recognized because of Split POs.

82.     The company further concluded that Ixia had not maintained effective ICFR for the first and second quarters of 2013.

83.     Ixia specifically identified a number of material weaknesses in its internal controls from those reporting periods, including a lack of competent and sufficient resources in its accounting department which had led to "widespread control deficiencies," and that the company's internal controls had not been designed to identify and assess Split POs and their revenue recognition accounting impact.

84.     Upon completion of the audit committee's internal investigation, Ixia allowed Miller to resign.  Liang was terminated.

**F.     Miller's False Representations to Auditors**

85.     As the company's chief financial officer, Miller signed and delivered management representation letters to Ixia's outside auditors in connection with the auditor's year-end audits and quarterly reviews.

86.     In the management representation letter to Ixia's auditors for the 2012 year-end audit, dated April 4, 2013, Miller represented that:

-     Miller had disclosed to the auditors "all deficiencies in the design or operation of internal control over financial reporting (whether or not remediated) identified" as part of his assessment of ICFR.

-     Miller had "no knowledge of any fraud or suspected fraud affecting the Company involving Senior management …

Management or other employees who have significant roles in internal control over financial reporting ….”

- Miller and the company had “identified and accounted for all revenue arrangements involving multiple deliverables in accordance with ASC 605, Revenue Recognition (ASC 605), 605-25, Multiple-Element Arrangements.”

- There are no material transactions, agreements or accounts that have not been properly recorded in the accounting records underlying the consolidated financial statements.

87.    In the management representation letter to Ixia's auditors for the first quarter 2013 review, dated May 10, 2013, Miller represented that:

- Miller had “disclosed to you all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that adversely affect the Company's ability to record, process, summarize, and report interim financial data that a) existed as of the fiscal quarter ended March 31, 2013 or b) were identified and remediated during the fiscal quarter ended March 31, 2013.”

- Miller had “no knowledge of any fraud or suspected fraud affecting the Company involving:  a. Senior management; b. Management or other employees who have significant roles in internal control over financial reporting …”

88.    In the management representation letter to Ixia's auditors for the second quarter 2013 review, dated August 9, 2013, Miller represented that:

- Miller had “disclosed to you all unremediated deficiencies in the design or operation of internal controls over financial reporting identified as part of our process to comply with Sections 302 and 404 of the Sarbanes Oxley Act of 2002 and Regulation S-K, Items 307 and 308, including separately disclosing to you all such deficiencies that we believe to be significant deficiencies or material weaknesses in internal controls over financial reporting.”

- Miller had “no knowledge of any fraud or suspected fraud affecting the Company involving:  a. Management.  b.

Employees who have significant roles in the Company's
internal control over financial reporting."

89.     Miller signed each of the management representation letters to Ixia's auditors for the 2012 year-end audit (dated April 4, 2013), for the first quarter 2013 review (dated May 10, 2013) and for the second quarter 2013 review (dated August 9, 2013).

90.     The foregoing representations by Miller in these management representation letters were false and misleading.

91.     For example, Miller had authorized a Split PO mandate for all multi-element transactions involving professional services, but this Split PO mandate violated Ixia's revenue recognition policy, circumvented its internal accounting controls, and exploited a material weakness in the company's ICFR (e.g., no procedures in place to relink split POs) for the purpose of prematurely recognizing software revenue in violation of GAAP.

92.     In addition, management with significant roles in Ixia's ICFR had engaged in a fraud or suspected fraud.

93.     Miller was aware that the foregoing statements to Ixia's auditors were false and did not make those false statements through ignorance, mistake, or accident.

94.     Miller further acted unreasonably in making those false statements to Ixia's auditors.

95.     This is because:  (i) Miller had directly participated in the implementation of Split POs at the company; (ii) he understood that professional services were expected to be a larger segment of the company's business and would be included in multi-element arrangements at an even greater frequency in the future; (iii) he also understood that even if professional services are reflected on a purportedly separate purchase order from software sales, GAAP and Ixia's revenue recognition policy still required deferral of software revenue in a multi-element arrangement; (iv) he consequently knew that Split POs contravened the company's

stated revenue recognition policy, circumvented its internal accounting controls, and had exploited a material weakness in Ixia's ICFR; and (v) Miller understood that the large transaction at the end of third quarter 2012 discussed above was material, under the terms of his April 4, 2013 management representation letter, and knew that the transaction had not been properly recorded in Ixia's accounting records because the customer's purchase order had been artificially split.

### G.    Liang's False Representations to Auditors

96.    In his role as Ixia's director of accounting, Liang was responsible for the proper accounting of Ixia's revenue recognition during the relevant period.

97.    During Ixia's outside auditors' 2012 audit and first and second quarter 2013 quarterly reviews, Liang was the auditors' primary point of contact at Ixia for revenue recognition issues.

98.    Thus, with respect to revenue recognition and Ixia's audit, Liang routinely performed the function of a controller or principal accounting officer.

99.    Although Liang knew of Split POs and understood that it presented a risk that Ixia's reported software revenue would be inaccurate, he took no action to cease the practice within Ixia, or at the least, to bring Split POs to the auditors' attention.

100.    Further, on at least three occasions, Liang participated in in-person meetings with Ixia's auditors in which revenue recognition for multi-element arrangements was a focus of discussion.  Although according to Ixia's auditor, any competent accountant would have brought Split POs to the auditors' attention at those times, Liang failed to do so, and therefore omitted to state a material fact necessary to make the affirmative representations he had made to Ixia's auditors, not misleading.

101.    Specifically, in July 2013, Liang met with Ixia's auditors and discussed risks associated with accounting for multi-element arrangements.  Even though Split POs were plainly pertinent to this discussion, Liang did not disclose the Split PO mandate to Ixia's auditors.

102.   Subsequent to that July 2013 meeting, Liang again met with Ixia's auditors in order to discuss Ixia's efforts to establish VSOE for its professional services.  While that issue was inextricably linked to Ixia's accounting for multi-element arrangements, Liang did not disclose the Split PO mandate to Ixia's auditors.

103.   Finally, at a September 4, 2013 meeting with Ixia's auditors, the risk of Split POs was a specific topic of discussion between Liang and the auditors. However, Liang never told them that the company was purposefully Splitting POs. In fact, despite discussing with auditors risk factors for when POs are inadvertently split, Liang failed to disclose that Ixia was actually Splitting POs on purpose, and had been doing so for some time.

104.   In addition, Liang, as Miller's subordinate in Ixia's finance department, was acting at Miller's direction during the foregoing events because Miller had tasked Liang with the responsibility of determining whether or not to discuss Split POs with Ixia's auditors.

105.   Liang was aware that the foregoing statements and omissions to Ixia's auditors were false and did not make those false statements and omissions through ignorance, mistake, or accident.

106.   Liang further acted unreasonably in making those false statements and omissions to Ixia's auditors.

107.   This is because:  (i) Liang had directly participated in the implementation of Split POs at the company; (ii) he understood that professional services were expected to be a larger segment of the company's business and would be included in multi-element arrangements at an even greater frequency in the future; (iii) he also understood that even if professional services are reflected on a purportedly separate purchase order from software sales, GAAP and Ixia's revenue recognition policy still required deferral of software revenue in a multi-element arrangement; and (iv) he consequently knew that Split POs would have been significant to the quarterly reviews being performed by Ixia's outside auditors.

## H.     Miller's False SOX Certifications

108.    In accordance with Section 302 of SOX and Exchange Act Rule 13a-14, Miller signed a certification which the company attached to its 2012 Form 10-K.

109.    In his certification, Miller represented that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report

> * * *

> I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors ….

> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

110.    The foregoing representations by Miller were false and misleading.

111.    Miller had not disclosed to the auditors or Ixia's audit committee "[a]ll significant deficiencies and material weaknesses" in the company's ICFR.  As alleged above, the company did not have the ability, once it began Splitting POs, to reliably identify all of its multi-element arrangements involving software and undelivered professional services, and therefore could not appropriately account for that revenue under the rules set forth by Ixia's revenue recognition policy.  Miller not only did not disclose this significant deficiency and material weakness in the company's SEC filings, he also did not disclose it to the outside auditors or audit committee.

112.    The certified representations were also false because Miller failed to

disclose to Ixia's auditors and audit committee that by authorizing Split POs, management and other employees with a significant role in ICFR had engaged in a fraud – namely, misrepresentations and omissions in Ixia's 2012 Form 10-K about the company's revenue recognition policy and its ICFR.

113.   Miller knew, or was reckless in not knowing, that his certifications were materially false and misleading, or acted unreasonably in making those certifications.

114.   Specifically, based on his knowledge, Miller was aware that Ixia's 2012 10-K contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

115.   And based on management's most recent evaluation of ICFR, Miller did not disclose:  (i) all significant deficiencies and material weaknesses in the design or operation of Ixia's ICFR which were reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and (ii) any fraud, whether or not material, involving management or other employees who had a significant role in Ixia's ICFR.

116.   This is because:  (i) Miller had directly participated in the implementation of Split POs at the company; (ii) he understood that professional services were expected to be a larger segment of the company's business and would be included in multi-element arrangements at an even greater frequency in the future; (iii) he also understood that even if professional services are reflected on a purportedly separate purchase order from software sales, GAAP and Ixia's revenue recognition policy still required deferral of software revenue in a multi-element arrangement; and (iv) he consequently knew that Split POs contravened the company's stated revenue recognition policy, circumvented its internal accounting controls, and had exploited a material weakness in Ixia's ICFR.

**I.   The Materiality of the False Statements and Omissions**

117.   Miller and Liang's misrepresentations and omissions to the outside

auditors and Miller's false SOX certifications all concern facts that would have been viewed by a reasonable investor or auditor as significantly altering the total mix of available information about the company.

118.   Ixia is a technology company that routinely transacted software sales through multi-element arrangements.  Therefore, the manner and timing in which it recognized software revenue – which represented a substantial part of Ixia's overall revenues – was a fundamental component of the company's financial reporting.

119.   Correspondingly, Ixia made affirmative representations to investors that specifically detailed the content of its revenue recognition policy for multi-element arrangements in its filings with the Commission.

120.   Notwithstanding this, Split POs resulted in:  the violation of Ixia's revenue recognition policy; the circumvention of its internal controls; and the exploitation of a material weakness in Ixia's ICFR in order to improperly recognize software revenue.  At the same time, Miller was falsely certifying and misrepresenting to auditors that he had fulfilled his responsibility to fully disclose any and all material weaknesses and fraud involving management with significant responsibility for ICFR to Ixia's auditors and audit committee, and Liang was concealing the practice from Ixia's outside auditors.  These misrepresentations and omissions would have been viewed by a reasonable investor as significant information, and would have altered the total mix of information about the company.

121.   Similarly, had they known the truth, the auditors would have considered Miller's misrepresentations and omissions in the management representation letters, and Liang's failure to disclose the issues regarding the Split PO practice to be information material to their annual audits and quarterly reviews of the company.

**J.    Miller's Circumvention of Ixia's Internal Controls and Falsification of its Books and Records**

122.   By authorizing the directive to Split POs, Miller circumvented Ixia's revenue recognition policy and Ixia internal accounting controls in place to ensure

complete and accurate sales documentation.

123. Miller was aware that he was circumventing Ixia's revenue recognition policy, and that circumvention was not the result of Miller's ignorance, mistake, or accident.

124. Similarly, by authorizing the directive to Split POs, Miller falsified Ixia's books and records at the end of 2012 and in the first and second quarters of 2013. With no controls in place to identify multi-element arrangements involving professional services and software purchase orders that had been earlier split because of Miller's directive, Ixia's books and records could not appropriately account for those revenues in accordance with the company's revenue recognition policy.

125. For example, Miller directly or indirectly falsified sales documentation relating to the Split POs, including quotes, purchase orders, invoices, and Ixia's related-revenue account entries for those transactions.

126. Miller was aware that he was falsifying Ixia's books and records, and that falsification was not the result of Miller's ignorance, mistake, or accident.

**K.    Liang's Circumvention of Ixia's Internal Controls and Falsification of its Books and Records**

127. By facilitating the directive to Split POs and concealing it from Ixia's auditors, Liang circumvented Ixia's revenue recognition policy and Ixia internal accounting controls in place to ensure complete and accurate sales documentation.

128. Liang was aware that he was circumventing Ixia's revenue recognition policy, and that circumvention was not the result of Liang's ignorance, mistake, or accident.

129. Similarly, by facilitating the directive to Split POs and concealing it from Ixia's auditors, Liang falsified Ixia's books and records at the end of 2012 and in the first and second quarters of 2013. With no controls in place to identify multi-element arrangements involving professional services and software purchase orders that had been earlier split, Ixia's books and records could not appropriately account

for those revenues in accordance with the company's revenue recognition policy.

130. For example, Liang directly or indirectly falsified sales documentation relating to the Split POs, including quotes, purchase orders, invoices, and Ixia's related-revenue account entries for those transactions.

131. Liang was aware that he was falsifying Ixia's books and records, and that falsification was not the result of Liang's ignorance, mistake, or accident.

## FIRST CLAIM FOR RELIEF

### Lying to Auditors

### Violations of Rule 13b2-2 of the Exchange Act

### (against Defendants Miller and Liang)

132. The SEC realleges and incorporates by reference paragraphs 1 through 131 above.

133. As alleged above in paragraphs 39-67 and 85-95 among other allegations, Miller lied to Ixia's auditors in his management representation letters when he represented that Ixia had identified and accounted for all of its multi-element arrangements in accordance with GAAP, that he had disclosed to them all significant deficiencies and material weaknesses in Ixia's ICFR, that he had no knowledge of any fraud or suspected fraud involving management or employees with significant roles in ICFR, and that there were no material transactions that had not been properly recorded at Ixia.

134. As alleged above in paragraphs 39-67 and 96-107, among other allegations, Liang lied to Ixia's auditors when he failed to disclose Split POs to them, despite having had many opportunities to do so when meeting and otherwise interacting with them as their point of contact at the company on revenue recognition issues.

135. By engaging in the conduct described above, Defendants Miller and Liang, directly or indirectly: (1) made or caused to be made a materially false or misleading statement to an accountant in connection with: (i) any audit, review or

examination of the financial statements of the issuer required to be made under the federal securities laws; or (ii) the preparation or filing of any document or report required to be filed with the Commission; or (2) omitted to state, or caused another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:  (i) any audit, review or examination of the financial statements of the issuer required to be made under the federal securities laws; or (ii) the preparation or filing of any document or report required to be filed with the Commission.

136.   Further, by engaging in the conduct described above, Defendant Liang, as a person acting under the direction of an officer of Ixia, directly or indirectly took action to coerce, manipulate, mislead, or fraudulently influence an independent public or certified public accountant engaged in the performance of an audit or review of financial statements that are required to be filed with the Commission, and knew or should have known that these actions, if successful, could result in rendering the issuer's financial statements materially misleading.

137.   Defendant Miller knew, or was reckless in not knowing, his statements to Ixia's auditors were materially false and misleading.  Miller further acted unreasonably in making the foregoing statements to Ixia's auditors.

138.   Defendant Liang knew, or was reckless in not knowing, that his statements and omissions to Ixia's auditors were materially false and misleading. Liang further acted unreasonably in his interactions with Ixia's auditors.

139.   Defendant Liang also knew or should have known that his actions – if successful – to coerce, manipulate, mislead, or fraudulently influence Ixia's auditors could have resulted in a material impact on Ixia's reported revenue.

140.   By engaging in the conduct described above, Defendants Miller and Liang violated, and unless restrained and enjoined will continue to violate Rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2.

## SECOND CLAIM FOR RELIEF

### False SOX Certification

### Violation of Rule 13a-14 of the Exchange Act

### (against Defendant Miller)

141.   The SEC realleges and incorporates by reference paragraphs 1 through 131 above.

142.   As alleged above in paragraphs 39-67, 85-95, and 108-116, Defendant Miller signed a certification of Ixia's 2012 Form 10-K in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14 promulgated thereunder. That certification was false because the annual report contained material misrepresentations and omissions about Ixia's compliance with its revenue recognition policy and about its ICFR, and because Miller had not disclosed to, among others, the company's auditors, all significant deficiencies and material weaknesses in its ICFR or any fraud by management with responsibility for Ixia's ICFR.

143.   By engaging in the conduct described above, Defendant Miller, as Ixia's principal financial officer, falsely certified a periodic report containing financial statements filed by an issuer in accordance with Exchange Act Section 13(a).

144.   By engaging in the conduct described above, Defendant Miller violated, and unless restrained and enjoined will continue to violate, Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

## THIRD CLAIM FOR RELIEF

### Circumvention of Internal Controls and Falsifying Books and Records

### Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder

### (against Defendants Miller and Liang)

145.   The SEC realleges and incorporates by reference paragraphs 1 through 131 above.

146.   As alleged above in paragraphs 15-67, among other allegations, Miller

COMPLAINT                                   26

knowingly authorized and Liang knowingly participated in a Split PO practice that circumvented Ixia internal accounting controls designed to ensure complete and accurate sales documentation.

147.   As alleged above in paragraphs 19-66, among other allegations, Miller and Liang knew that Ixia's internal accounting controls required that order documentation reflect the details of all other orders or open negotiations for products that were discussed as part of the order, and that as a result, Split POs had generated books and records that failed to accurately reflect Ixia's sales transactions.

148.   By engaging in the conduct described above, Defendants Miller and Liang knowingly circumvented, or knowingly failed to implement, a system of internal accounting controls.

149.   By engaging in the conduct described above, Defendants Miller and Liang knowingly falsified books, records, and accounts issuers are required to make and keep which, in reasonable detail, accurately and fairly reflect the issuer's transactions and dispositions of its assets.

150.   By engaging in the conduct described above, Defendants Miller and Liang have violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5) and Rule 13b2-1 thereunder, 17 C.F.R. § 240.13b2-1.

### FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of**

**Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act**

**(against Defendants Miller and Liang)**

151.   The SEC realleges and incorporates by reference paragraphs 1 through 131 above.

152.   As alleged above in paragraphs 15-67, among other allegations, Split POs resulted in the falsification of Ixia's books and records, and, given the absence of any procedures in place to later relink split purchase orders so that multi-element

arrangements could be properly accounted for, exploited a material weakness in Ixia's internal accounting controls for the purpose of prematurely recognizing software revenue in violation of GAAP.  Because Miller and Liang knowingly participated in Split POs, lied about or concealed the practice from Ixia's outside auditors and audit committee, and (in the case of Miller) falsely certified Ixia's 2012 Form 10-K in connection with the practice, Miller and Liang substantially assisted the falsification of Ixia's books and records and the company's failure to implement effective internal controls.

153.   By reason of the conduct described above, Ixia violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by:  failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Ixia; and failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets.

154.   By reason of the conduct described above, Defendants Miller and Liang knowingly and recklessly provided substantial assistance to, and thereby aided and abetted Ixia in its violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and (B).

155.   By engaging in the conduct described above, Defendants Miller and Liang have aided and abetted, and unless restrained and enjoined, are reasonably likely to continue to aid and abet, violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and (B).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

COMPLAINT                                        28

## I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Miller and Liang, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Miller, and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

## IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Miller and Liang, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## V.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Miller and Liang, and their

agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from aiding and abetting any violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## VI.

Order Defendants to pay civil penalties under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  February 3, 2017

/s/ Gary Y. Leung
Gary Y. Leung
Jason P. Lee
Attorneys for Plaintiff
Securities and Exchange Commission